UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VARLYA F. HANUSIK,

    Plaintiff,

v.

Case No. 06-11258

HONORABLE DENISE PAGE HOOD

HARTFORD LIFE INSURANCE COMPANY,

    Defendant.
_____/

# ORDER GRANTING
# PLAINTIFF'S CROSS-MOTION FOR JUDGMENT

## I.    INTRODUCTION

This matter is before the Court on Plaintiff's Cross-Motion for Judgment [Dkt. #14, filed December 15, 2006] and Defendant's Cross-Motion for Judgment [Dkt. #15, filed December 15, 2006]. The parties filed Responses on January 11, 2007 [Dkt. #17] and January 12, 2007 [Dkt. #18], respectively. The parties filed Replies on January 22, 2007 [Dkt. #20] and January 22, 2007 [Dkt. #19], respectively. Plaintiff argues that Defendant wrongfully terminated her long-term disability ("LTD") benefits after seven years. For the reasons stated below, this Court reverses Defendant's termination of Plaintiff's LTD benefits.

## II.    FACTS

### A.    Overview

On February 27, 1997 Plaintiff Varlya Hanusik slipped and fell in a strip mall parking lot, injuring her neck and back. (Pl.'s Mot., at 2.) At that time, she worked as a secretary and was insured under a long-term disability policy ("LTD Policy" or "Policy") issued by Defendant

Hartford Life and Accident Insurance Company ("Hartford"). (*Id.*) She applied for LTD benefits in July of 1997 and began receiving LTD benefit payments under the Policy's "own occupation" standard in September of 1997. (*Id.* at 4.) In September of 1999, Plaintiff began receiving LTD benefit payments under the "any occupation" standard. (*Id.* at 4-5.) Hartford terminated Plaintiff's benefit payments on January 19, 2005. (*Id.* at 8.) Plaintiff received her last LTD benefit check in January of 2005. (*Id.* at 19.)

Under Plaintiff's LTD Policy with Hartford, a participant is first entitled to twenty-four (24) months of benefits if she establishes with written proof that, due to accidental bodily injury, she is unable to perform the essential duties of her occupation. (R. at 937-38.) To receive benefits after twenty-four (24) months, a participant must establish that she is unable to perform the job duties of "any occupation for which . . . [she] is qualified by education, training or experience." (R. at 938.) Under both standards, Hartford "reserves the right to determine if . . . [a participant's] written proof of loss is satisfactory." (R. at 950.) Hartford has full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the [Policy]." (R. at 952.)

B.     Plaintiff's Medical Condition

Since 1997, Plaintiff has been under the primary care of Dr. Abraham Slain. Under the care of Dr. Slain, Plaintiff was initially diagnosed with chronic cervical and lumber pain and carpal tunnel syndrome. (Pl.'s Mot., at 4-5.) Dr. Slain based these determinations on Plaintiff's subjective complaints of pain, numbing, fatigue, weakness, and limited range of motion. (*Id.* at 6-8.) Dr. Slain confirmed Plaintiff's subjective complaints with x-rays, MRIs, and physical examinations. (*Id.*) Dr. Slain's diagnosis was confirmed by other doctors, including Dr. Kwang Yoon and Dr. David

2

Montgomery. (*Id.* at 5.) Based on his diagnosis, Dr. Slain believed that Plaintiff was unable to work. (*Id.* at 7.)

Since November 2004, Plaintiff has also been under the care of Dr. Daniel Ryan. (*Id.* at 11.) Based upon his examination of Plaintiff and her complaints of numbness, muscle atrophy, and weakness in her arms and legs, Dr. Ryan diagnosed Plaintiff with post-polio syndrome. (*Id.*) Plaintiff acquired the polio virus as a young child. (*Id.*) Dr. Ryan believes that a full-time job would accelerate the symptoms of Plaintiff's post-polio syndrome. (*Id.* at 12.) Both Dr. Ryan and Dr. Slain believe that Plaintiff is disabled and unable to work because she has post-polio syndrome. (*Id.* at 11-12.)

In January of 2004, Hartford began conducting video surveillance of Plaintiff. (Def. Mot., at 6.) The surveillance covers seven days: January 12 & 13, April 11, June 11 & 15, and November 2 & 13, 2004. (R. at 842-43.) During these days, Hartford observed Plaintiff performing the following activities: engaging in a mile-long morning walk with a near-normal gait, scratching her back, getting in and out of her car, driving, pumping gas, going to church, and eating lunch in a restaurant. (*Id.*)

In November of 2004, Hartford mailed the video surveillance and a Hartford Physical Evaluation form to two of Plaintiff's doctors, including Dr. Slain. (Def. Mot., at 7.) Dr. Slain completed the Hartford Physical Evaluation form on December 17, 2004. (R. at 443.) Hartford received the form on January 3, 2005. (*Id.*) Dr. Slain indicated on the form that Plaintiff can sit for 2-3 hours at a time, stand for 1 hour at a time, walk for 2 hours at a time, and drive for 2 hours at a time. (R. at 442.) Dr. Slain left blank a portion of the form which requested the total number of hours that Plaintiff could work in a day. (*Id.*) In a March 24, 2005 deposition, Dr. Slain clarified that

Plaintiff was unable to work. (R. at 809.) He indicated that although she could sit, stand, walk, and drive, "she can't do all of them on the same day" because she "usually will tire out." (R. at 811.) He further indicated that "she can't work 8 hours or even 4 hours." (R. at 812.)

On January 19, 2005, shortly after receiving Dr. Slain's Physical Evaluation form, Hartford informed Plaintiff that she no longer qualified for LTD benefits. (Pl.'s Mot., at 8.) Plaintiff appealed Hartford's decision on July 14, 2005. (*Id.*) In addition to including several physician statements in her appeal, Plaintiff also included statements from her husband, sister, daughter, and neighbor. (*Id.* at 8-12.) The statements provided by Plaintiff's family members generally indicated that she was able to do many things such as walking and sitting, but that when she exerted too much energy doing those things, she could not function the following day. (R. at 686, 688-89.)

Hartford selected Dr. Robert Mercer to review Plaintiff's medical records on appeal. (Def.'s Mot., at 9.) Dr. Mercer spoke to both Dr. Slain and Dr. Ryan concerning their respective examinations of Plaintiff. (*Id.*) Dr. Mercer also reviewed Plaintiff's medical record dating back to March 1997, as well as the surveillance video provided by Hartford. (*Id.*) Based upon his review of Plaintiff's medical records and Hartford's surveillance video, Dr. Mercer concluded that Plaintiff's medical records did "not contain objective information that would preclude Ms. Hanusik from functioning at a full-time sedentary occupation with repetitive activity." (*Id.*) Hartford denied Plaintiff's appeal on September 20, 2005, determining that she could perform the occupations of "Clerk, Case Aide, Referral Clerk, Temporary Help Agency, and Gate Guard." (*Id.* at 7, 10.) This lawsuit followed.

### III. STANDARD OF REVIEW & APPLICABLE LAW

The general rule is that the district court must review a plan administrator's denial of benefits

4

*de novo*, unless the benefit plan gives the plan administrator authority to determine eligibility for benefits or to construe the terms of the plan. *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555 (6th Cir. 1998) (en banc). If the benefit plan gives the plan administrator authority to determine eligibility for benefits or to construe the terms of the plan, a district court must apply the arbitrary and capricious standard of review. *Id.* The arbitrary and capricious standard of review is a deferential standard. *Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997). Under the arbitrary and capricious standard, an administrator's decision must be upheld if it is "rational in light of the plan's provisions." *Id.* (citations removed). A decision is rational if the administrator can offer "a reasoned explanation, based on the evidence, for a particular outcome." *Id.* (citations removed). When reviewing the administrator's decision, a district court may only consider evidence contained within the record. *Id.*

When reviewing a participant's claim or appeal of disability, a plan administrator is not obliged to accord special deference to the opinions of a plaintiff's treating physician. *Bishop v. Metropolitan Life Ins. Co.*, 70 Fed. Appx. 305, 311 (citing *Black & Decker Disability Plan v. Nord*, 123 S. Ct. 1965, 1967 (2003)). Further, plan administrators may rely on video surveillance of a participant to assist with its determination of the participant's eligibility. *See, e.g.*, *Wu v. Liberty Life Assur. Co. of Boston*, 2006 WL 1521947, at *4 (W.D. Mich. May 31, 2006) (plaintiff alleged that she required a cane for ambulation but surveillance video demonstrated plaintiff walking without it). Plan administrators may also rely on third-party testimony of a participant's activities to assist with its determination of the participant's eligibility. *See, e.g.*, *Hensley v. Fortis Benefits Insurance Co.*, 1999 WL 1005651, at *4 (W.D. Mich. Aug. 24, 1999) (plaintiff alleged that he was disabled but a co-worker observed plaintiff playing golf without a limp).

5

In determining whether a plan administrator acted arbitrarily or capriciously, a court must take into account the "possible conflict of interest" that a plan administrator's reviewing physician may have when making a determination of the participant's health. *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 292 (6th Cir. 2005). A court must also take into account a plan administrator's "decision to conduct a file review rather than a physical exam" of the participant. *Id.* at 295.

## IV. ANALYSIS

Although Plaintiff argues that the *de novo* standard of review applies to this case by default, she does not offer any support for this argument. (Pl.'s Mot., at 14.) Defendant argues that the arbitrary and capricious standard should apply pursuant to *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555 (6th Cir. 1998) (en banc). The Court concludes that *Perez* is controlling. Here, the benefit plan explicitly grants the plan administrator authority to determine eligibility for benefits or to construe the terms of the plan. (R. at 952.) Pursuant to *Perez*, the Court must review Hartford's decision to terminate Plaintiff's LTD benefits under the arbitrary and capricious standard. *Perez*, 150 F.3d at 555.

As noted previously, Plaintiff was injured in February of 1997, resulting in severe back pain, limited range of motion, and numbness. In 2004, Plaintiff was diagnosed with post-polio syndrome. (R. at 844-46.) Prior to 1997, Plaintiff's medical history contained objective evidence of the polio virus, spinal surgery, and carpal tunnel syndrome. (*Id.*) After her 2004 diagnosis of post-polio syndrome, Plaintiff continued to experience a variety of problems associated with these conditions, including but not limited to: back pain, numbness in her extremities, hand/arm weakness, leg weakness, and fatigue. (*Id.*) All of these conditions and associated symptoms are documented repeatedly throughout her medical records, albeit with some variation.

After repeated physical examinations of and discussions with Plaintiff over a period of more than seven years, Dr. Slain, Plaintiff's primary care physician, concluded that Plaintiff was unable to work; similarly, based on his physical examination of and discussion with Plaintiff, Dr. Ryan concluded that Plaintiff was unable to work. (Pl.'s Mot., at 11-12.) In the face of these facts and conclusions, Hartford terminated Plaintiff's benefits because it concluded that her medical records contained no objective information that would preclude her from working a full-time sedentary position. (R. at 684.) In making this determination, Hartford relied almost exclusively on the video surveillance of Plaintiff that it collected and the conclusion reached by Dr. Mercer after he reviewed Plaintiff's medical records. (*Id.*) For two main reasons, the Court finds that Hartford's decision to terminate Plaintiff's LTD benefits was arbitrary and capricious.

First, Hartford's reliance on the video surveillance of Plaintiff in deciding to terminate her LTD benefits was neither reasonable nor rational. Hartford makes much of the fact that it captured footage of Plaintiff in the acts of, among other things, walking for about a mile on five occasions for about a half hour; operating a car on five occasions; going to church on two occasions; and scratching her back on two occasions. However, it was never alleged that Plaintiff was unable to do any of these activities. *Cf. Wu v. Liberty Life Assur. Co. of Boston*, 2006 WL 1521947, at *4 (W.D. Mich. May 31, 2006) (where plaintiff alleged that she required a cane for ambulation and surveillance video demonstrated plaintiff walking without it). Dr. Slain indicated that Plaintiff was unable to do all of those activities on the same day for a continuous period of eight or four hours. (R. at 811.) Similarly, Plaintiff's family members indicated that Plaintiff is unable to function on a particular day if she exerts too much energy on the previous day. (*Id.* at 686, 688-89.) However, the video surveillance fails to show Plaintiff either performing any single or combination of

7

activities for an eight or four hour period, or strenuously exerting herself over the course of two consecutive days.

It appears that the June 15, 2004 surveillance of Plaintiff shows her performing activities over the longest period of observed time. Dr. Mercer's report on the surveillance reads as follows:

> On 6/15/04, she was observed walking in the neighborhood with another woman approximately one mile over approximately 25 minutes. She returned home at 7:30 a.m. and then left her home at 8:50 a.m. driving to a church. She exited the church at 1:10 p.m., ambulating in a normal fashion, opening the hatch of her car and retrieving a plastic bag. She left the church at 2:28 p.m. and arrived home at 2:35 p.m.

(R. at 842.) From this passage, several facts could be gathered, including the fact that Plaintiff can walk for 25 minutes and that it takes her approximately 7 minutes to travel from church to her home. However, this video cannot be reasonably relied upon to refute the statements of Dr. Slain regarding Plaintiff's abilities, because it cannot reasonably concluded from this surveillance that Plaintiff was fully engaged in continuous activity from 7:00 a.m. to 2:35 p.m. During the 80 minutes that Plaintiff is in her home, the surveillance video provides no indication of what she is doing. Similarly, the surveillance video provides no indication of what Plaintiff does while she spends five hours inside the church.

Even though Defendant conducted surveillance of Plaintiff for more eleven months, it appears that the footage taken on January 12th and 13th is the only surveillance conducted over a consecutive two-day period. Dr. Mercer's report on the surveillance for these two days reads as follows:

> On 1/12/04, a woman identified as Ms. Hanusik is seen walking at a normal to mildly rapid pace with another woman. Intermittently, the images are dark and difficult to discern. No abnormalities in gait are apparent. At 7:24 a.m., she is seen opening her car door with her left hand. Additional images show her walking to her car and entering the car without apparent restriction at about 10:00 a.m. She is then seen

8

> walking to her car at about 11:50 a.m. again in a normal manner. Then she is seen at 1:08 p.m. filling up her car at a gas station. She used her right hand to facilely screw on the gas cap. Images from 1/13/04 again show Ms. Hanusik walking with another woman at about 6:58 a.m.

(R. at 843.) It can reasonably be concluded from this passage that Plaintiff has the ability to walk on two consecutive mornings if she limits her activities on the first day to walking from her front door to the driveway three times and driving to a gas station to get gas once. However, this video cannot be reasonably relied upon to refute the statements of Plaintiff's family members regarding her inability to function on a day if she over-exerts herself on the previous day, because the video provides no evidence that Plaintiff over-exerted herself on January 12th. It is undisputed that Plaintiff can, without over-exerting herself, sit for 2-3 hours at a time, or stand for 1 hour at a time, or walk for 2 hours at a time, or drive for 2 hours at a time. (R. at 442.) It follows, therefore, that Plaintiff could perform the combined January 12th activities of walking for 30 minutes, walking to her car three times, and getting gas from the gas station, over a timespan of more than six hours, without exerting too much energy. That said, Plaintiff's ability to walk for 30 minutes on January 13th does not prove her ability to work a sedentary job.

In light of the statements from treating doctors and family members submitted by Plaintiff, Hartford's remark in its September 20, 2005 termination letter to Plaintiff that "the degree of [Plaintiff's] reported fatigue is inconsistent with the observed activities on surveillance" is unsupported by the evidence. Accordingly, Hartford's termination of Plaintiff's LTD benefits was not "rational in light of the plan's provisions." *Smith*, 129 F.3d at 863.

Second, Dr. Mercer's conclusion regarding Plaintiff's ability to work is not supported by the evidence in the record. Although Dr. Mercer concludes that "the record does not include objective information that would preclude Ms. Hanusik from functioning at a full-time sedentary level," (R.

9

at 850,) his review of Plaintiff's medical records confirms the diagnoses of Drs. Slain and Ryan. Like Drs. Slain and Ryan, Dr. Mercer concludes that Plaintiff has cervical spondylosis, carpal tunnel syndrome, and post-polio syndrome. (*Id.* at 844-46.) Dr. Mercer also believes that EMG testing would help to better understand the extent of Plaintiff's post-polio syndrome. (*Id.* at 846.) Dr. Mercer's only issue with the diagnoses of Drs. Slain and Ryan appears to be that, over the course of more than seven years, some of their findings were either inconsistent or not reproducible. (*Id.* at 847-48.)

Because Dr. Mercer concludes that the extent of the symptoms associated with Plaintiff's post-polio syndrome are exaggerated without having examined her, it follows that he relied heavily, if not exclusively, on the surveillance video to reach his conclusion. Dr. Mercer repeats several times throughout his report that Plaintiff's reported symptoms were inconsistent with what he observed in the video. (*See, e.g.*, R. at 845, 846, 848.) As noted previously, however, the surveillance video cannot be reasonably relied upon to determine the extent of Plaintiff's fatigue symptoms. Dr. Mercer's reliance on the video to assess Plaintiff's ability to work was therefore not "rational in light of the plan's provisions." *Smith*, 129 F.3d at 863.

Dr. Mercer's analysis has other flaws. For instance, Dr. Mercer indicates in his report that, based upon a review of Plaintiff's medical records, "no clear objective changes" have occurred in Plaintiff's medical condition "that would document a change in functional capability compared to the time period of 1997 through 2003," except for Plaintiff's new symptoms associated with post-polio syndrome. (R. at 847.) This statement demonstrates that Plaintiff's condition indeed worsened from 1997 to 2005. Nevertheless, based upon the limited information provided by the video surveillance with regard to Plaintiff's abilities, Dr. Mercer makes the incredible conclusion that "the

10

record does not include objective information" that would preclude Ms. Hanusik from working. (R. at 848.) The Court also finds it noteworthy that Dr. Mercer fails to discuss in his report the statements provided by Plaintiff's family members regarding her symptoms. This fact carries significant weight in light of Hartford's decision directing Dr. Mercer to conduct a file review rather than a physical exam.

When the Court accounts for Hartford's reliance on the surveillance video and the unsupported conclusions of Dr. Mercer, and considers both Hartford's potential conflict of interest and Dr. Mercer's failure to examine Plaintiff, it appears that Hartford acted arbitrarily and capriciously in terminating Plaintiff's LTD benefits. That Hartford was not obliged to give special deference to the opinions provided by Plaintiff's physicians does not alter the Court's conclusion, because, here, Dr. Mercer's opinion was not supported by the record.

Although Defendant's past determinations that Plaintiff was disabled does not and should not bind it in making future determinations of her disability, *Silvey v. FMC Corp. Long-Term Disability Plan*, 1997 WL 690156, at *4 (6th Cir. Nov. 21, 1997), the change of its position, without any credible factual support for the change, is impermissible, *Calvert v. Firstar Finance, Inc.*, 409 F.3d at 292. Even under the deferential standard of review which applies to this case, Defendant must demonstrate a "principled reasoning process" "based on substantial evidence" to terminate benefits. *Bishop*, 70 Fed. Appx. at 310-11. In other words, Defendant must be provided with some new information, information to which it was previously not privy, that establishes Plaintiff's ability to work. *See, e.g.*, *Wu*, 2006 WL 1521947, at *4 (plaintiff alleged that she required a cane for ambulation but surveillance video demonstrated plaintiff walking without it). No such new credible information, other than an indication that Plaintiff's condition has worsened with a diagnosis of post-

11

polio syndrome, has been provided here. Accordingly, Hartford's decision to terminate Plaintiff's LTD benefits must be reversed.

Plaintiff's claim for benefits is brought pursuant to section 502(a)(1)(B) of ERISA, which empowers a participant or beneficiary to sue "to recover benefits due under the terms of his plan, to enforce h[er] rights under the terms of the plan, or to clarify h[er] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The principal relief under this section is an order reinstating benefits and awarding retroactive benefits. *See, e.g., Wenner v. Sun Life Assur. Co.*, 482 F.3d 878, 884 (6th Cir. 2007). The Court will therefore order an immediate reinstatement of LTD benefits, beginning with the benefit payable in February 2005.

In addition to requesting the retroactive reinstatement of her benefits, Plaintiff requests interest, costs, and attorney's fees pursuant to 29 U.S.C. § 1132(g)(1). (Pl.'s Mot., at 20.) District courts have broad discretion in awarding attorney's fees and costs in ERISA actions. *Hoover*, 290 F.3d at 809. District courts also have discretion in awarding prejudgment interest. *Id.* (citing *Maurer v. Joy Techs., Inc.*, 212 F.3d 907, 919 (6th Cir. 2000)). The Court awards applicable interest, costs, and attorney's fees. However, Eastern District of Michigan Local Rules 54.1 and 54.1.2 require that Plaintiff file these motions, along with supporting authority, after the entry of judgment. LR 54.1; LR 54.1.2.

## V. CONCLUSION

For the reasons set forth above,

IT IS ORDERED that Plaintiff's Cross-Motion for Judgment [Dkt. #14, filed December 15, 2006] is **GRANTED**. The Court directs Defendant to immediately reinstate Plaintiff's LTD benefits, retroactive to February 2005.

IT IS FURTHER ORDERED that Defendant's Cross-Motion for Judgment [Dkt. #15, filed December 15, 2006] is **DENIED**.

S/Denise Page Hood
Denise Page Hood
United States District Judge

Dated: January 31, 2008

I hereby certify that a copy of the foregoing document was served upon counsel of record on January 31, 2008, by electronic and/or ordinary mail.

S/William F. Lewis
Case Manager